DANIEL T. HAYWARD
Nevada Bar No. 5986
LAXALT & NOMURA, LTD.
9600 Gateway Drive
Reno, Nevada 89521
Telephone: (775) 322-1170
Attorneys for Defendant
JEFF CODEGA PLANNING AND DESIGN, INC.

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CV-N-04-0292-LRH-VPC |
| Plaintiff, | ) | |
| | ) | - consolidated with - |
| v. | ) | |
| | ) | CV-N-04-0397 |
| SHARLANDS TERRACE, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| AND RELATED CLAIMS | ) | |
| | ) | |
| | ) | |

## REPLY OF THE DESIGN/CONSTRUCTION DEFENDANTS IN SUPPORT OF JOINT MOTION FOR ENTRY OF CONSENT DECREE

Defendants/Cross-Defendants JEFF CODEGA PLANNING & DESIGN, INC.,

SHARLANDS TERRACE, LLC, BLATT DEVELOPMENT OF NEVADA, INC.,

MICHAEL T. BLATT, JAMES TIBBENS dba SAN JOAQUIN DESIGN GROUP

(collectively, the "Design / Construction Defendants"), by and through their respective

counsel of record, submit the reply in support of *the Joint Motion for Entry of Consent Decree*

filed October 5, 2006.

The Current Owners have opposed the other parties' joint motion by listing 14 reasons

why they find the proposed decree to be "unfair" (Dkt. No. 277, pp. 4-8), followed by a

1

several legal arguments concerning the Court's authority to enter the proposed Consent

Decree. The Design / Construction Defendants will address each of the Current Owners' 14

enumerated objections to the text of the Consent Decree. The Design / Construction

Defendants also join in the United States' reply with respect to the power of the Court to enter

the Consent Decree, and expert Phillip Zook, AIA's averments that the proposed decree

resolves all pending Fair Housing Act ("FHA") issues at the property.

### 1. Absence of design standards.

The Current Owners and their retained expert, Brent Beals, complain that the Consent

Decree makes no provision for "basic design standards," and that the design work will be

performed by San Joaquin and JCP&D. In fact, the proposed remediation --- both interior and

exterior --- has been reviewed and approved by the United States and its expert, Phillip Zook,

AIA, and found to be fully compliant with the FHA.

The Current Owners have conveniently disregarded Paragraph 19 of the Consent

Decree which establishes that the Design / Construction Defendants are to provide to the

United States, Silver State Fair Housing Council ("SSFHC") and the Current Owners:

> . . . plans setting forth the retrofits to be completed in accord with Appendix A, in
> sufficient detail so that the plans may be evaluated to determine their compliance with
> the Fair Housing Act. These plans shall be provided within ten (10) days of the entry
> of this Decree. . . .

(Dkt. 273, *Joint Motion for Entry of Consent Decree*, Ex. A, *Consent Decree*, 9:12-15)

Paragraph 19 sets forth the process by which the Current Owners may dispute the plans or any

other requirements of that paragraph. (Id.)

Appendix A to the proposed Consent Decree lists in detail all of the items that need to

be remediated pursuant to the FHA standards. Paragraph 20 of the Consent Decree details the

role of a "Neutral Inspector" who will have expertise in the design and construction

2

1  requirements of the FHA, and will have the contractual responsibility to: (1) ensure that the

2  plans are consistent with Appendix A; and (2) determine if the performed retrofits have been

3

4  completed in accord with Appendix A. (Dkt. 273, Ex. A, *Consent Decree*, 9:21 – 10:3)

5  Plans, specifications, and shop drawings have been prepared by the Design / Construction

6  Defendants and Bison Construction, and will be submitted to the Current Owners upon entry

7  of the Consent Decree pursuant to Paragraph 19. (*See* Ex. 1, Aff. of J. Martin, para. 8, 18.2)

8      The Construction Contract between Bison Construction and the Design / Construction

9  Defendants expressly incorporates all "applicable laws, statutes, ordinances, building codes,

10  rules and regulations including, without limitation, the Fair Housing Act" as part of the

11

12  controlling construction documents. (Ex. 2, *AIA Contract* [hereinafter referred to as the

13  "*Construction Contract*"], sec. 1.2) All work must be performed in compliance with FHA

14  requirements and standards as summarized by Appendix A to the Consent Decree, and

15  "reasonably consistent with and reasonably equivalent to that which is replaced." (Id., sec.

16  2.2; *see also* sec. 2.6.1 and 2.6.4)

17

18      With respect to the exterior flatwork remediation, the only "design" to be done is the

19  removal of certain non-compliant concrete sidewalks, curb-cuts, and ramps and steps, and

20  installation of the same so as to create the required accessible routes throughout the property.

21  (Dkt. 273, *Joint Motion for Entry of Consent Decree,* Ex. A, *Consent Decree,* Appx. A)

22  Details for the construction of the sidewalks, curb-cuts and ramps consistent with FHA safe

23  harbors are obtainable from the City of Reno or other sources. The only design work to be

24  done is the determination of where to place replacement and/or new sidewalks, curb-cuts and

25  ramps so as to create the required accessible route. This has already been done following

26

27  extensive *direct* input from the Current Owners during a lengthy on-site inspection of the

28                                3

property.[1]  (*See* Ex. 2, *Construction Contract*, Ex. D thereto depicting location of sidewalk, curb-cut, and building approach remediation elements; *see also* Ex. 1, Aff. of J. Martin, para. 6-10)

To summarize, the required plans, as well as the other various protective provisions incorporated into the Consent Decree and the related documents referenced herein, will ensure that the project is properly designed and constructed and should alleviate any concerns the Current Owners' may have as to any potential adverse affect upon them and the design standards of the project.

## 2.  Absence of construction standards.

The Design / Construction Defendants have taken various protective steps to ensure that the construction standards are more than sufficient – including establishing the presence on the project of NCS, the Neutral Inspector and their collective duty to ensure the construction is done in a matter consistent with the Consent Decree (and related documents), all legal requirements and FHA standards.

The Current Owners complain that there is no provision for the retention of a "construction manager", or provisions to ensure compliance with acceptable standards of construction.  They offer no explanation of what imagined harm could be avoided through the

---

[1]    On March 28, 2006, the parties --- including representatives of the Current Owners --- counsel for the parties, Plaintiffs' expert Phillip Zook, AIA and the Current Owners' expert, Brent Beals, and John Martin, principal of Bison Construction, walked the site for several hours in part to determine the manner in which to remediate the ground floor entrance walkways.  Frankly, JCP&D understands that the plan attached as Exhibit D to the Construction Contract, and Appendix A to the Consent Decree, are completely consistent with the Current Owners' wishes.  In some instances, existing walkways with non-compliant steps have been left in place in place so as to provide a more direct means of entry for non-disabled tenants, and "parallel" FHA-compliant walkways have been added for disabled persons.  In two specific instances, railings have been called for along ground floor entrance walkways because they eliminate the need for longer, serpentine approaches in these tight areas.  Again, JCP&D understands that this is what the Current Owners desired.  No other railings have been called for in either Exhibit D to the Construction Contract or Appendix A to the Consent Decree out of deference to the Current Owners, who found them to be unsightly.

4

payment of funds to a construction manager. Further, the Construction Contract between the Design / Construction Defendants and Bison Construction expressly requires that Bison follow all "applicable laws, statutes, ordinances, building codes, rules and regulations including, without limitation, the Fair Housing Act" as part of the controlling construction documents. (Ex. 2, *Construction Contract*, sec. 1.2)

The Current Owners further object to the proposed Consent Decree for its purported failure to provide for the "retention of a construction manager to protect the Owners' interests relative to the proper performance of the work." The Current Owners aver that compliance with applicable standards of construction is not ensured. This is simply not the case as evidenced by the Neutral Inspector provisions of Paragraph 20 of the proposed Consent Decree.

Furthermore, the Design / Construction Defendants and Bison Construction have entered into a Disbursement Agreement with Nevada Construction Services, a Nevada corporation ("NCS"), which requires that the *full* cost of the remediation be placed into an NCS-controlled general trust account to be released and distributed to Bison as such become due throughout the remediation process. NCS is charged with the responsibility of ensuring that all work invoiced in the applications for payment are performed in accordance with the requirements of the Consent Decree and the Construction Contract. (*See* Ex. 3, *Disbursement Agreement*, pp. 3-4, sec. 5) Section 7 of the Disbursement Agreement expressly requires NCS to:

> . . . inspect said Project and each unit for which payment is sought to determine . . . if the units have been completed in accordance with each item of the Consent Decree and the Construction Contract.

As for provisions to ensure the compliance with applicable standards of construction, the Construction Contract clearly requires that Bison Construction uphold all applicable laws, statutes, ordinances, building codes, rules and regulations including, without limitation, the FHA. (Ex. 2, *Construction Contract*, sec. 1.2)  Additionally, both Paragraph 20 of the Consent Decree and Section 2.5 of the Construction Contract establish that a third-party Neutral Inspector with expertise in the design and construction requirements of the FHA will be appointed to the project and, according to the Construction Contract, shall be required to:

> . . . conduct on-site inspections of the retrofits performed under the Consent Decree *to determine if the retrofits are completed in accord with Appendix A of the Consent Decree.*  The inspector shall have expertise in the design and construction requirements of the Fair Housing Act. . . . [Emphasis added.]

(Ex. 2, *Construction Contract*, sec. 2.5)  Paragraph 24 of the Consent Decree requires the Design / Construction Defendants to correct any deficiencies found by the Neutral Inspector if, after the Neutral Inspector's final inspection, it is found that not all of the required retrofits have been properly completed.

The Current Owners have also been granted approval rights with respect to the identity of the Neutral Inspector.  (Dkt. 273, *Joint Motion for Entry of Consent Decree,* Ex. A, *Consent Decree*, 9:25-27)  Thus, the Current Owners' alleged concerns regarding the absence of construction standards in the performance of the remediation and retrofits are not *legitimate* concerns which should prevent the entry of the Consent Decree.

### 3.    No Owner input on selection of contractor.

There is no legal support for the notion that the Current Owners can dictate with whom the Design / Construction Defendants must contract to complete the remediation, which of course would remove any reasonable element of competition from the bidding process and force the Design / Construction Defendants to pay whatever potentially

6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

unreasonable or inflated price the appointed contractor may demand. Further, as discussed in footnote 1, *supra*, and the attached affidavit of Bison Construction's John Martin (Ex. 1), the Current Owners' supposed ignorance of who has been selected to perform the remediation is disingenuous: Mr. Martin has visited the site on several occasions with the Current Owners' counsel's advance permission. (Ex. 1, para. 6, 9) Bison Construction is a Nevada licensed general contractor, and has performed major FHA remediation work in the past in the Reno area, specifically in connection with the Sierra Point litigation. (Id., para. 2, 11-16) Notably, the Current Owners have not suggested that they would have preferred that any *other* particular contractor be selected. In fact, the Current Owners have only now, at a convenient time, indicated any displeasure with the involvement of Bison Construction on this project.

The Design Defendants have also ensured that Bison Construction's performance will meet the highest standards and minimize any potential hardships to the present tenants in the Construction Contract by providing the following provisions:

> § 2.6.4 The Contractor warrants to the Construction Defendants that *materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents*, that the Work will be free from defects not inherent in the quality required or permitted, *and that the Work will conform to the requirements of the Contract Documents and all applicable laws, statutes, ordinances, building codes, rules, regulations and quality construction practices*. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the Construction Defendants, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

> § 2.6.5 Pursuant to Article III of the Consent Decree, *Contractor shall minimize any undue hardship to the Sharlands Terrace tenants in scheduling and performing the retrofits to ground-floor units.* Subject to the retrofit schedule set forth in Article III, Contractor shall confer with the Construction Defendants, and if required by the final Consent Decree entered by Court, the current property owners, regarding the order by which the required construction shall be completed.

7

1

2    **§ 2.6.6** Contractor shall be responsible for cooperating with Construction Defendants
     to keep Construction Defendants up to date regarding its progress under the retrofit
3    schedule of the ground-floor units, as set forth in Article III of the Consent Decree, *to*
     *assure proper and timely notice to the Sharlands Terrace tenants.* [Emphasis
4    added.]

5    (Ex. 2, *Construction Contract*, sec. 2.6.4 through 2.6.6, emphasis supplied)

6
     Thus, despite the Current Owners tardy objections regarding a lack of input into the
7
     selection of Bison Construction to perform the modifications and retrofits, it is clear that
8
9    Bison is a highly qualified contracting firm which has sufficient experience to undertake a

10   renovation project of this character. (*See* Ex. 1, Aff. of J. Martin, para. 2, 11-16) There are

11   also extensive contractual assurances between the Design / Construction Defendants, Bison

12   and NCS, which shall ensure that the performance of the work completed at the project will

13   be of the highest standards and completed in a manner which minimize any potential
14
     hardships to the current Sharlands Terrace tenants – *as well as their landlords*.
15

16       **4.    No provision for bonding or inadequate funding to assure performance.**

17       This alleged concern actually presents no concern at all. The Construction Contract

18   between Bison Construction and the Design / Construction Defendants provides that Bison

19   will remediate the property for a sum certain. (Ex. 2, *Construction Contract*, sec. 2.7.2 "The

20   extent of the Construction Defendants' liability to the Contractor under the Contract shall be

21   limited to the individual amounts payable to the Contractor pursuant to the Side Agreement.")
22
     Thus, the risk of overruns is born by Bison Construction, not the Design / Construction
23
24   Defendants. Work not conforming to the contract documents, including Appendix A to the

25   Consent Decree and the FHA itself, may be considered "defective" and must be corrected.

26   (Id., sec. 2.6.4, 1.2, 2.2, 2.6)

27

28                                         8

Nor is there a need or requirement for a bond as the construction funds are paid in full from the beginning. Per the Construction Contract, the $1,328,570.80 in funding for the project must be tendered to NCS (*not* held by the individual Design / Construction Defendants) and placed into an NCS-controlled account for disbursement to Bison Construction in accord with a written disbursement agreement. (Ex. 2, *Construction Contract,* sec. 4.1; Ex. 4, Change Order No. 001 (revising contract sum); Ex. 3, *Disbursement Agreement,* p. 1) Thus, the construction funds will be deposited with and handled by a third party construction control professional, which will ensure that disbursements are made to Bison as construction proceeds.

Lastly, the Construction Contract provides that final payment shall not be made to Bison Construction unless and until the Neutral Inspector has conducted all inspections and has certified that the retrofits required by the Consent Decree have been performed, all punch list items have been completed, and a *Certificate of Final Payment* has been submitted by Nevada Construction Services to the Design / Construction Defendants. (Ex. 2, *Construction Contract,* sec. 5.3)

With respect to the concerns regarding a bond, such is not necessary because full and adequate funding is assured by the terms of a *Defense Agreement* entered into by the Design / Construction Defendants (also referred to as the "Side Agreement"). Paragraph 4 of the *Defense Agreement* explicitly states the Design / Construction Defendants shall deposit:

> . . . within 30 days of the entry of the Consent Decree, *funds equal to the amount of Bison Construction's Contract which that Party is responsible* . . . to an account with Nevada Construction Services or other agreed upon construction control administer . . . *for the purpose of funding the remediation of Sharlands Terrace Apartments* set forth in the Consent Decree and Appendix A to the Consent Decree and Bison's Contract ("Construction Funds"). [Emphasis added.]

(Ex. 5, *Defense Agreement,* p. 4, para. 4; *see also* Ex. 3, *Disbursement Agreement,* sec. 2)

1    Paragraph 4 of the Defense Agreement further details the inability of the Design /

2    Construction Defendants to withdraw the deposited funds, to wit:

3

4        No Party shall have the right to withdraw Construction Funds from the account except
         as provided for in the Bison Contract and the Nevada Construction Services Contract,
5        unless mutually agreed to in writing by all Parties hereto. [Emphasis added.]

6    (Id., p. 5, para. 4)  As discussed above, NCS will control when payments are made to Bison

7    Construction.  (Ex. 3, *Disbursement Agreement*, sec. 5)

8        In the event of change orders or cost overruns during the construction phase of the

9    project (which under the terms of the Construction Contract is a risk bourn by Bison

10   Construction), the Design / Construction Defendants have further protected the interests of the

11   Current Owners by agreeing as follows:

12

13       5.      The monies necessary to fund cost overruns or other unforeseen expenses shall
         *not* be drawn from the account referenced in paragraph 4.  Each particular cost
14       overrun item or other unforeseen expense which Bison Construction is legally entitled
         to under the Bison Contract *shall be allocated to the Party responsible for that*
15       *particular aspect of the remediation.*  Any cost overruns shall first be satisfied by
         interest that may have accrued on the Construction Fund. [Emphasis added.]
16

17   (Ex. 5, *Defense Agreement*, p. 6, para. 5)

18       To address the Current Owners' worries about potential mechanic's liens being

19   recorded against their property, the Disbursement Agreement with NCS ensures that payment

20   will be made to Bison Construction and any other potential lien claimant.  Section 5.4 of the

21   Disbursement Agreement directs NCS to withhold final payment until all final lien releases

22   have been provided by contractor and any other potential lien claimant.

23

24       Thus, it is evident that the Design / Construction Defendants have taken extensive

25   steps to ensure the protection of the Current Owners and the completion of the renovation

26   work.  Even in the unlikely event that the funding for the work is depleted, responsibility for

27   funding the cost overruns or other unforeseen expenses shall be placed the party responsible

28
                                              10

for that particular aspect of the work.  The Design / Construction Defendants have protected the Current Owners so that they will not be left with an uncompleted apartment complex.

### 5.    Not all FHA violations will be repaired --- Owners subject to future liability.

The Current Owners, through their expert, Mr. Beals, have identified *two* "specific deficiencies" which they contend the proposed Consent Decree fails to address:  (1) correcting the deficient turning radius in the dwelling unit kitchens, and (2) various issues in the kitchen in the community building.  (Notably, they do not complain that the Consent Decree fails to remedy *any* exterior violations.)  The Design / Construction Defendants join in the Plaintiffs' reply points and authorities to the extent they explain why these alleged deficiencies are not, in fact, FHA violations.

With respect to future liability of the Current Owners, the Design / Construction Defendants cannot prevent someone from filing a misguided lawsuit against the Current Owners, or anyone else.  However, the Current Owners have no legitimate concern that they will be held *liable* for any alleged deficiences in the design or construction of Sharlands Terrace.  They neglect to point out the simple fact that they can never be held liable by an individual for designing or constructing the property in violation of the FHA, *because the Current Owners did not design or construct the property.*  Whether they may be held liable for future active discrimination against disabled persons (for example, refusing to lease to disabled persons altogether) is another matter, and one which has nothing to do with the Design / Construction Defendants or the proposed Consent Decree.  Moreover, any future design / construction claim submitted to HUD would be administratively closed, because the property will already be subject to a Consent Decree.

11

### 6.    Renovation downgrades will devalue property.

The Current Owners ask this Court to accept the peculiar argument that a property which allegedly *violates* the FHA is worth more than one which *complies* with the FHA. More specifically, they contend that the remediation called for by the Consent Decree may fail to preserve the "aesthetic and functional features" of Sharlands Terrace. With all due respect, the Design / Construction Defendants have no idea what the Current Owners are talking about, and suggest that the vague nature of the Current Owners' argument confirms that they have nothing specific in mind, either. Such vague, speculative "damages," which even the Current Owners cannot describe in any detail and which have not yet occurred, are not grounds for a claim for damages, let alone denial of entry of the decree. Trustmark Ins. Co. v. General & Cologne Life Re of America, 424 F.3d 542, 552 (7th Cir. 2005) (citing Illinois law, and explaining that damages cannot be based on potential or future loss, unless it is reasonably certain to occur, nor can damages be based on speculation or conjecture).

### 7.    Shortcut repairs will devalue property.

As set forth in footnote 1, *supra*, the allegation that the use of "parallel sidewalks" instead of removing certain existing non-compliant sidewalks was done in order to save the Design / Construction Defendants money at the Current Owners' expense is specious. Presumably, the Opposition was penned by someone other than the counsel who walked the site with Bison Construction's John Martin and the Current Owners' representatives and expert, during which the manner of concrete flatwork repairs was discussed at great length. The Current Owners' wishes regarding which ground floor entrance walkways should be removed, which should be equipped with railings, and which should be left in place and

12

paired with a parallel compliant walkway have been *adopted* by the Design / Construction Defendants, not ignored.

## 8.    Damages caused by renovation work.

The Current Owners ask the Plaintiffs, Design / Construction Defendants and the Court to speculate that the remediation process will damage other concrete flatwork, landscaping, and "other components of the development." (Dkt. No. 277, *Opposition,* 5:21-26)  As is the case with various other elements of damage raised in the Current Owners' opposing papers, such damage has not occurred and may never occur.  Further, the Construction Contract requires that Bison Construction perform the remediation in conformance with "quality construction practices," and final payment will not be made until all punch list items identified by the Neutral Inspector have been completed. (Ex. 2, *Construction Contract,* sec. 2.6.4, 5.3)

## 9.    Time of completion may be extended up to 3.5 years.

The Current Owners complain that although the Consent Decree requires that the public and common use areas be remediated within 180 days, and the ground floor units within nine months, the Court retains jurisdiction for 3-1/2 years.  The retention of jurisdiction is primarily in order that the Court may enforce the various equitable provisions of the decree, which require affirmative acts be taken by the Design / Construction Defendants during the 3-1/2 year term of the decree.[2]

---

[2]    Dkt. 273, *Joint Motion for Entry of Consent Decree,* Ex. A, *Consent Decree,* sec. 49 (term of Consent Decree is 3-1/2 years); sec. 35 (reporting requirements concerning involvement with multifamily dwellings); sec. 39 (posting non-discrimination policy); sec. 40 (advertising requirements); sec. 41 (reporting new complaints to the United States); sec. 42 (preservation of records); sec. 43 (completion of educational requirements and providing new employees copy of Consent Decree); sec. 47 (various equitable requirements).

13

1    The Current Owners' other point is that the Consent Decree allows the required

2    completion deadlines to be extended by mutual agreement of the Plaintiffs and relevant

3    Defendants. The rationale for this language is simple: For example, if JCP&D requests that

4    its design professionals be allowed a one-week extension of the date by which they must

5    attend the educational classes they are required to attend under the terms of the Consent

6    Decree, they may seek such approval from the United States. The non-affected parties

7

8    (including the Current Owners): (1) need not be bothered with a request that does not concern

9    or affect them, and (2) will not be permitted to effectively "veto" such a request and force the

10   requesting party into a technical violation of the Consent Decree. The Plaintiffs have a clear

11   incentive to require the remediation to be conducted as quickly as possible and in a quality

12   manner, and any concern that they would agree to an unwarranted extension of the completion

13   deadlines is completely unfounded.

14

15        **10.    Inadequate protection of tenants' rights.**

16        The Current Owners' sky-is-falling assessment of how the implementation of the

17   remediation will actually affect individual tenants is inaccurate and unrealistic. Bison

18   Construction believes, based upon past remediation work involving an apartment complex,

19   that no more than four replacement units will be necessary for tenants displaced from their

20   units at any one particular point in time. (*See* Ex. 1, Aff. of J. Martin, para. 22) In John

21   Martin's personal experience, tenants tend not to wish to leave their units if that is at all

22   possible. (Id.)

23

24        Further, the Current Owners fail to realize, or at least to make clear to the Court, that

25   the nature of the interior remediation to any particular unit is not terribly extensive. As

26   explained by Mr. Martin, the scope of work purposed for Sharlands Terrace does not involve

27

28                                                  14

removing walls within the units, as did the Sierra Point remediation. (Id. at para. 17)  Much if

not all the remediation to the interiors of even the most complex units can be completed

within two to four days, each. (Id.)  He anticipates that the initial units will take more time

(approximately four days), but that after material and labor are "tuned in," the work should be

able to be completed within approximately two days per unit. (Id.)  The exterior site work

will be minimally invasive, as the plans call for Bison to largely preserve the original

stair/steps. (Id. at para. 18; *see also* Ex. 2, *Construction Contract*, Ex. D thereto)

### 11.    Lost income to Owners.

The Current Owners purport to fear that the Consent Decree may divert employees at

the property away from their usual tasks and thus result in increased expense, may lead to

tenant inconvenience and thus reduced occupancy, and may even require the property

manager to coordinate with repair contractors to fix yet-to-occur damage which they *postulate*

will occur as the result of the remediation.  As more fully described above, the proposed

Consent Decree contains provisions designed to minimize, if not eliminate, such concerns.

But in any event, such speculative damages are not recoverable because they are, on their

face, not reasonably certain to occur.  Trustmark Ins. Co. v. General & Cologne Life Re of

America, 424 F.3d 542, 552 (7th Cir. 2005) (citing Illinois law, and explaining that damages

cannot be based on potential or future loss, unless it is reasonably certain to occur, nor can

damages be based on speculation or conjecture).  The remediation of the property has not

even taken place.  Therefore, it is impossible to determine whether the Current Owners will

suffer *any* such losses as a consequence.  Certainly there is no authority for the proposition

that either Plaintiffs, the Design / Construction Defendants or this Court are required to: (1)

presume that such damages will in fact occur; and (2) somehow endeavor to estimate the

amount of such damages, and provide for payment of those yet-to-be-realized damages in the Consent Decree.

The Current Owners would also have this Court speculate as to the reaction of *each individual tenant* to the interior remediations, including whether each tenant would prefer to stay and not seek compensation, demand a replacement unit, or demand a reduction in that month's rent. It is unclear the extent (if any) to which tenants will be inconvenienced, given that remediation may be performed after tenants terminate their leases or while units are otherwise vacant. Simply put, these alleged damages must be raised after they occur, if they indeed ever do. They do not constitute a basis for foregoing entry of the Consent Decree as written.

## 12. **Increased management cost to Owners.**

This has been adequately addressed in the immediately preceding section.

## 13. **Owners excluded from remedies in the event decree is violated.**

The Current Owners *do* have a remedy if they believe that the Design / Construction Defendants, or Plaintiffs, have violated the terms of the Consent Decree. They can petition the Court for enforcement of the Consent Decree.

## 14. **No attorney or expert fees to Owners.**

If the Magistrate Judge's report and recommendation (Dkt. No. 276) are adopted as the order of this court, then the Current Owners will not have any FHA claim under which to seek an award of attorney or expert fees under the Act. With respect to their common law claims against the Design / Construction Defendants, the relevant claims against the Blatt Defendants have been referred to private arbitration. JCP&D and San Joaquin have no

16

contract with the Current Owners[3], and such costs and expenses are not recoverable as damages in a common law professional negligence action. "Nevada follows the American rule that attorney fees may not be awarded absent a statute, rule, or contract authorizing such award." Thomas v. City of North Las Vegas, 2006 Nevada LEXIS 7, 127 P.3d 1057, 1063 (2006). The United States Code addresses recoverable litigation costs by a prevailing party *after* the judge or jury has returned a decision on liability and damages. *See* 28 U.S.C. 1920. Neither may be claimed as "damages" in connection with the Current Owners' pending state law claims. Lastly, the Current Owners would be barred from recovering such costs and expenses under the "economic loss rule" adopted in Nevada. *See* Calloway v. City of Reno, 116 Nev. 250, 993 P.2d 1259 (2000). Thus, there is no legal vehicle or basis upon which the Current Owners may recover attorney fees and expert expenses. They may not hold up the entry and implementation of the Consent Decree based upon their unilateral, baseless desire.

For the foregoing reasons, the Design / Construction Defendants pray for the order of the Court entering the proposed Consent Decree as written, and for such other and further relief as the Court deems appropriate.

DATED this 6th day of November, 2006.

LAXALT & NOMURA, LTD.

DANIEL T. HAYWARD
Nevada Bar No. 5986
9600 Gateway Drive
Reno, Nevada 89521
Attorneys for Defendant
JEFF CODEGA PLANNING
AND DESIGN, INC.

---

[3] This has not, unfortunately, prevented the Current Owners from suing San Joaquin and JCP&D under a third-party beneficiary theory based upon the contracts between San Joaquin / JCP&D and Blatt Development. JCP&D's contract with Blatt Development, in particular, contains an express non-assignability clause.

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HAMILTON & McMAHON, LTD.

/s/

_____
BRIAN M. McMAHON
Nevada Bar No. 927
577 California Avenue
P.O. Box 40638
Reno, Nevada 89504-4638
Attorneys for Defendants SHARLANDS
TERRACE, LLC, BLATT DEVELOPMENT
OF NEVADA, INC., and MICHAEL BLATT


FAHRENDORF, VILORIA OLIPHANT &
OSTER, LLP

/s/

_____
R. SHAWN OLIPHANT
Nevada Bar No. 6441
P.O. Box 3677
Reno, Nevada 89505
Attorneys for Defendant JAMES TIBBENS,
dba SAN JOAQUIN DESIGN

18

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b), I certify that I am an employee of LAXALT & NOMURA, LTD., and that I caused a true and correct copy of the foregoing pleading to be served:

_____ (BY MAIL) on all parties in said action, by placing a true copy thereof enclosed in a sealed envelope in a designated area for outgoing mail, addressed as set forth below. At the Law Offices of Laxalt & Nomura, mail placed in that designated area is given the correct amount of postage and is deposited that same date in the ordinary course of business, in a United States mailbox in the City of Reno, County of Washoe, Nevada.

_____ (BY PERSONAL DELIVERY) by causing a true copy thereof to be hand delivered this date to the addressee(s) at the address(es) set forth below.

_____ (BY FACSIMILE) on the parties in said action by causing a true copy thereof to be telecopied to the number indicated after the address(es) noted below.

_____ Federal Express or other overnight delivery

_____ Reno/Carson Messenger Service

___X___ Electronic

addressed as follows:

Kenneth D. Johnson
Joseph Gaeta
Housing and Civil
Enforcement Section
Civil Rights Division U.S.
Department of Justice
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530
Telephone: (202) 514-6781
Facsimile: (202) 514-1116

Michael J. Flynn, Esq.
Flynn Law Group
1099 E Street
San Rafael, CA 94901
Telephone: (415) 482-9933
Facsimile: (415) 482-9939

William E. Peterson, Esq,
Morris, Pickering & Peterson
6100 Neil Road, Suite 555
Reno, Nevada 89511
Telephone: (775) 829-6000
Facsimile: (775) 829-6001

Brian M. McMahon
Hamilton & McMahon, Ltd.
577 California Avenue
P.O. Box 40638
Reno, Nevada 89504-4638
Telephone: (775) 348-2700
Facsimile: (775) 348-2745

19

1

2

3  Christopher Brancart, Esq.
   Brancart & Brancart
4  8205 Pescadero Road
   Loma Mar, CA 94021
5  Telephone: (650) 879-0141
   Facsimile: (650) 879-1103

6                                              Suellen Fulstone, Esq.
                                               Littler Mendelson, P.C.
7                                              50 W. Liberty St., Suite 400
   Thomas W. Chaffee, Esq.                     Reno, Nevada 89504-4638
8  Pandell Law Firm, Inc.
9  990 North California Blvd,
   Ste 1010
10 Walnut Creek, CA 94596                      R. Shawn Oliphant, Esq
   Telephone: (925) 974-1700                   Lane, Fahrendorf, Viloria & Oliphant
11 Facsimile: (925) 974-1709                   P.O. Box 3677
                                               Reno, Nevada 89505
12                                             Telephone: (775) 348-9999
                                               Facsimile: (775) 348-0540
13
   Greg Addington
14 Assistant United States Attorney
   (Nev. St. Bar. No. 6875)
15 100 W. Liberty Street, Ste 600
   Reno, Nevada 89501
16 Telephone: (775) 784-5438
   Facsimile: (775) 784-5181
17

18

19                                             this 6th day of November, 2006

20

21

22                                             An employee of Laxalt & Nomura, Ltd.

23

24

25

26

27                                             20

28